UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MIAMI VALLEY FAIR HOUSING
CENTER, INC., *et al.*,

        Plaintiffs,

    v.                                 Case No.: 2:15-cv-2737
                                         JUDGE SMITH
                                       Magistrate Judge Jolson

PREFERRED REAL ESTATE
INVESTMENTS, LLC, *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court upon two separate motions for summary judgment. Defendants Preferred Real Estate Investments, LLC, Preferred Real Estate Investments II, LLC, Preferred Real Estate Investments, Inc., Andover Park, LLC, Taylor House, LLC, Palmer Square, LLC, Clifton Park, LLC and Alexander Square, LLC (collectively, the "Preferred Defendants") filed their Motion for Summary Judgment on August 24, 2016 (Doc. 58). Plaintiffs Miami Valley Fair Housing Center ("MVFHC") and the Central Ohio Fair Housing Association ("COFHA") responded (Doc. 65) and the Preferred Defendants replied (Doc. 69). Defendant Jonathan Barnes Architecture and Design, Ltd. ("JBAD") filed its own Motion for Summary Judgment (Doc. 70) to which Plaintiffs responded (Doc. 73) and JBAD replied (Doc. 82). Both motions are fully briefed and are ripe for disposition.[1] For the following reasons, both Motions are **GRANTED in part and DENIED in part**.

---

[1] Although Plaintiffs have requested an oral argument on the present Motions, the Court has been supplied with a thorough record and the Court does not need to hear further arguments from the parties prior to disposition.

## I.  BACKGROUND

This action arises out of alleged violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. §§ 3601–3619.  Plaintiffs allege that Preferred Defendants and JBAD violated and continue to violate the accessibility requirements of the FHAA, thereby discriminating against people with disabilities.  (Doc. 2, Am. Compl. at ¶¶ 1–2).  Plaintiffs allege that Palmer House, Clifton Park, Andover Park, Alexander Square, and Taylor House (the "Subject Properties")—all of which are multifamily dwellings located in and around Columbus, Ohio—were not designed or constructed in conformity with the FHAA (*Id.* at ¶ 2).

Plaintiff MVFHC is a non-profit organization that aims to eliminate housing discrimination.  MVFHC's home office is located in Dayton, Ohio.  MVFHC's website sets forth its mission statement:

> The mission of the Miami Valley Fair Housing Center (MVFHC) is to eliminate housing discrimination and ensure equal housing opportunity *for all people in our region*.
>
> Specifically, the Miami Valley Fair Housing Center seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex disability, familial status, or any other characteristic protected under state or local laws. In furthering this goal, MVFHC engages in activities designed to encourage fair housing practices through educational efforts; assists person who believe they have been victims of housing discrimination; identified barriers to fair housing practices; works with elected and government representatives to protect and improve fair housing laws; and takes all appropriate and necessary action to ensure that fair housing laws are properly *enforced throughout the Miami Valley*.

(Doc. 58-7, MVFHC Miss. Stmt. (emphases added)).  MVFHC's Director of Investigations and Enforcement, Anita Schmaltz, confirmed that this statement is an accurate portrayal of MVFHC's mission.  (Doc. 58-6, Schmaltz Dep. at 67–68).  Another MVFHC employee, Miranda Wilson, testified that MVFHC's service area included Montgomery, Preble, Miami,

Greene, Warren, and Butler counties, Springfield, Ohio, and parts of Springboro, Ohio.  (Doc. 58-8, Wilson Dep. at 17).

Located in Columbus, Plaintiff COFHA is also a non-profit organization with the same ultimate goal as MVFHC—ending housing discrimination—but for people throughout central Ohio.  (Doc. 2, Am. Compl. at ¶ 9).  In 2014, MVFHC formed COFHA to serve as a separate organization with a physical presence in Columbus.  (Doc. 65-9, McCarthy Dep. at 77).  In fact, COFHA's mission statement is identical to MVFHC's except it identifies a different geographic region as its service area.  (*Compare* Doc. 58-7, MVFHC Miss. Stmt. ("Miami Valley") *with* Doc. 65-13, COFHA Miss. Stmt. ("Central Ohio")).  COFHA is essentially an extension of MVFHC, formed as a consequence of MVFHC's perceived lack of fair housing advocacy in the Columbus area.  (*See* Doc. 65-8, Zimmerman Dep. at 95–96; Doc. 65-9, McCarthy Dep. at 337–338; Doc. 65-11, Schmaltz Dep. at 179).  Despite the intent for COFHA to exist as a distinct legal entity from MVFHC, MVFHC wanted to retain control of COFHA in light of the considerable time, effort, and money MVFHC spent creating the organization.  (Doc. 65-9, McCarthy Dep. at 77).  As a result, COFHA and MVFHC share many of the same board members and executives.  (*See* Doc. 58-13, COFHA Code of Regs. at 3; Doc. 58-14, COFHA Inter. Resps. at 2–3).  Much like MVFHC, COFHA pursues its mission through assistance to victims of housing discrimination, education and outreach, public policy initiatives, advocacy, investigation of potential fair housing violations, and enforcement of the FHAA.  (Doc. 2, Am. Compl. at ¶ 9.).

Preferred Defendants include past and present developers, builders, and/or owners of some or all of the Subject Properties.  (*Id.* at ¶¶ 10–18).  Each of Preferred Defendants is

3

organized under the laws of Ohio.  (*Id.*).  JBAD is an Ohio corporation based out of Columbus that designed Taylor House.

In 2014, Anita Schmaltz was looking at websites of Preferred Defendants' multifamily dwellings in the Columbus area and noticed what she perceived to be FHAA violations.  (Doc. 65-11, Schmaltz Dep. at 170).  According to Plaintiffs, this discovery caused them to divert resources to investigate and counteract Defendants' discriminatory conduct.  Schmaltz investigated the Subject Properties before visiting and "testing" Clifton Park and Alexander Square.  (*Id.* at 174–75).  "Testers" are individuals who visit a property with no intent to purchase or rent but only to collect evidence.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).  Having found what she believed to be multiple FHAA violations at Clifton Park and Alexander Square, Schmaltz employed the aid of Jim McCarthy.  McCarthy, the President and CEO of both MVFHC and COFHA, called for more testing to be conducted at Alexander Square and Andover Park.  (Doc. 65-11, Schmaltz Dep. at 293–94, 296).  This additional testing was to be conducted by Miranda Wilson and Rochelle Johnson, who is quadriplegic and uses a wheelchair.    (Doc. 65-16, Wilson Dep. at 60).    Another MVFHC/COFHA employee, Thom Curnutte,[2] was tasked with obtaining building plans for the Subject Properties from the City of Columbus.  (Doc. 65-18, Curnutte Dep. at 17, 52).  MVFHC also retained two professional architects and an inaccessibility consultant to evaluate some of the Subject Properties.    Finally, Plaintiffs argue that they had to take extensive measures to counteract the discriminatory practices of Defendants.  Specifically, MVFHC sponsored and participated in a 2015 Ohio fair housing conference in Columbus.  (Doc. 65-21, MVFHC Memo).  Curnutte was required to attend and provide "primary staffing" of an education and

---

[2] The parties dispute whether Curnutte is an employee of COFHA or MVFHC.  The Court will address this issue below.

4

outreach booth at the conference.  (*Id.*).  Finally, Plaintiffs allege that they continue to attend fair

housing conferences and provide educational material to counteract Defendants' conduct.

## II.    STANDARD OF REVIEW

Preferred Defendants and JBAD moved for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment

motion is not "to weigh the evidence and determine the truth of the matter" but to "determine

whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on

"sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or

"not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249–

50.

The party seeking summary judgment shoulders the initial burden of presenting the court

with law and argument in support of its motion as well as identifying the relevant portions of

"'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial

burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts

showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v.*

*Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant

must "produce evidence that results in a conflict of material fact to be resolved by a jury").  In

considering the factual allegations and evidence presented in a motion for summary judgment,

the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id.*

## III.    DISCUSSION

Preferred Defendants and JBAD both moved for summary judgment on the grounds that Plaintiffs lacked standing and, alternatively, on the merits of the claims.  JBAD's Motion incorporated by reference all of the standing-related arguments already made by Preferred Defendants.  Plaintiffs responded in kind by incorporating by reference the arguments it raised in opposition to Preferred Defendants' Motion.  As such, this Opinion and Order applies to both Motions equally.

### A.    Standing

#### 1.    Applicable Law

Pursuant to Article III of the United States Constitution, federal jurisdiction is limited to "cases" and "controversies," and standing is "an essential and unchanging part of" this requirement.  U.S. Const. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  A federal court must not go "beyond the bounds of authorized judicial action and thus offend[] fundamental principles of separation of powers."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  If the plaintiff lacks standing, the federal court lacks jurisdiction.  Thus, standing is "the threshold question in every federal case."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Id.*

Standing under Article III has three elements.  "First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted).  Second, the injury must be "fairly traceable to the

challenged action of the defendant." *Id.* (Internal alterations omitted).  Third, it must be likely that the injury will be "redressed by a favorable decision." *Id.* at 561.  The burden is on the party invoking federal jurisdiction to demonstrate Article III standing.  *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008).  Last, each element of standing must be supported with the "manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561.

Here, Plaintiffs seek to invoke organizational standing on their own behalf.  An organization may assert standing on its own behalf if "it has suffered a palpable injury as a result of the defendants' actions." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333 (6th Cir. 2002).  Further, an organization must establish "that its ability to further its goals has been 'perceptibly impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens*, 455 U.S. at 379).

The Supreme Court first addressed organizational standing under the Fair Housing Act in *Havens*.  *Havens* involved a fair housing organization whose activities included "the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination."  455 U.S. at 368.  The organization was notified that an apartment complex was potentially discriminating against prospective tenants on the basis of race. *Id.*  The organization sent two testers—one Caucasian and one African American—to the complex and confirmed that racial steering was occurring. *Id.*  The Court found a concrete and demonstrable injury because the discriminatory conduct "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers . . . with the consequent drain on the organizations resources[.]" *Id.* at 379.

7

In the wake of *Havens*, the Sixth Circuit has recognized "the circuits generally agree that an organization meets Article III standing requirements where it can show that the defendant's alleged violations of the Fair Housing Act caused it to divert resources from other projects or devote additional resources to a particular project in order to combat the alleged discrimination." *Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 474 (6th Cir. 2006)[3] (citing *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers,* 141 F.3d 71, 78 (3rd Cir. 1998)).  However, the circuit courts have differing views concerning the extent to which they will consider litigation related injuries.  Some circuits require injury that is "completely independent from the economic and non-economic costs of the litigation."  *Id.* at 474 (citing *inter alia Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.  Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.")).  Other circuits take a more lenient approach and only require a "showing that the [organization] diverted resources toward litigation to counteract the defendant's housing discrimination.  *Id.* (citing *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2nd Cir. 1993); *Arkansas ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434–35 (8th Cir. 1998)).  The Sixth Circuit has adopted a similarly lenient approach, requiring "a plaintiff to show some injury that is independent of the costs of litigation, [but] costs related to prelitigation investigation can form the basis for standing."  *Id.* at 475.

---

[3] This Order and Opinion primarily cites the Sixth Circuit's opinion from *Olde St. Andrews*, 210 F. App'x 469.  The Court will denote any reference to the trial court opinion and order (250 F. Supp. 2d 706) by using the identifier "*Olde St. Andrews II.*"

In *Hooker v. Weathers*, 990 F.2d 913 (6th Cir. 1993), the Sixth Circuit made perhaps its most important ruling in terms of defining the boundaries of what constitutes an injury for organizational standing purposes.  There, a married couple contacted a fair housing organization because the couple felt the operator of the trailer park in which they lived was discriminating against them on the basis of their age.  *Id.* at 914.  The organization sent a tester to the trailer park to confirm the conditions reported by the Hookers.  *Id.*  The housing organization filed suit after the tester was prevented from renting the Hooker's trailer because she was "too young."  *Id.* The court ultimately found standing because "[the organization] devoted resources to investigating the defendants' practices and alleges that it has confirmed that defendants do discriminate on the basis of familial status."  *Id.* at 915.

The Sixth Circuit reached a similar conclusion in *Hughes v. Peshina*, 96 F. App'x 272 (6th Cir. 2004).  In *Hughes*, a married couple and their three young children attempted to rent a duplex and were denied by the duplex owners.  *Id.* at 273.  The couple contacted a fair housing organization who investigated the claim and then filed two administrative complaints on the basis that the couple was discriminated against on the basis of familial status.  *Id.* at 273–74. Although standing was not being disputed, the court found that the organization had standing because it "devoted its efforts to investigating whether [the duplex owners] had violated the law, thus diverting its resources away from the other housing services it provides and frustrating its mission of insuring fair housing practices.."  *Id.* at 274.

In *Olde St. Andrews*, the court revisited *Hooker* and *Hughes*, among other cases.  There, the court found that plaintiff had organizational standing where a fair housing organization, on its own volition, discovered what it perceived to be accessibility discrimination.  *Olde St. Andrews*, 210 F. App'x at 470–71.  The organization sent testers to the property who identified

9

multiple FHAA violations.  *Id.*  The Sixth Circuit conferred organizational standing based on the

organization's expenditures related to the deployment of the testers.  *Id.* at 476–77.  The Sixth

Circuit also rejected the defendants' argument that the alleged injury was not fairly traceable to

the defendants' conduct because the organization initiated the investigation on its own rather

than at the request of an individual.  *Id.* at 478.  The court concluded that "[r]egardless of

whether an organization learns of potential discrimination through independent complaints or

through its own observations, any action it takes in combating that discrimination is fairly

traceable to the defendant's discriminatory acts."  *Id.*

Finally, in *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 805 F. Supp. 2d 396 (S.D.

Ohio 2011) ("*Connor Grp. I*"), this Court found organizational standing after a thorough analysis

of *Hooker*, *Hughes*, *Olde St. Andrews*, and other controlling case law.  805 F. Supp. 2d at 405.

In determining Miami Valley's motion for partial summary judgment, this Court relied on an

affidavit from Miami Valley's President and CEO, Jim McCarthy which stated:

> MVFHC's resources were diverted as a result of its investigation and this lawsuit,
> and its mission frustrated by Defendant The Connor Group's actions.  Because of
> time spent monitoring the advertisements by this Defendant, I and other members
> of my staff were precluded from doing other fair housing activities.  MVFHC
> contemporaneously keeps track of our staff time on various projects.  Despite
> filing an administrative action regarding one of the advertisements, The Connor
> Group did not appear to change the types of illegal ads they placed on Craigslist.
> MVFHC expended thousands of dollars worth of staff time in pre-litigation
> monitoring of The Connor Group and in other efforts designed to combat their
> discriminatory advertising, such as developing and presenting programs in the
> community.

*Id.* at 403–04.  On appeal, the Sixth Circuit affirmed that Miami Valley had organizational

standing because it alleged that it "had to divert its resources, its staff time and energy to identify

the ad and then to bring the ad to the attention of the appropriate authorities," thereby suffering a

harm of $5,292.15 in costs.  *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571,

576 (6th Cir. 2013) ("*Connor Grp. II*").

### 2.    Analysis

Admittedly, the Court has a difficult time reconciling this line of case law with the well-established principle that standing cannot be manufactured and a case or controversy cannot be created by a plaintiff on account of his or her own actions.  *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982); *Spann*, 899 F.2d at 27.  Nor is this the first time a court has expressed hesitation in applying the liberal standard established in *Hooker*.  In *Olde St. Andrews*, the defendant urged the Sixth Circuit to overturn *Hooker*.  After noting that the trial court "reluctantly" conferred standing, the court passed on the opportunity to reaffirm *Hooker* and instead stated that the Court must adhere to the rule prohibiting one panel from overturning a prior published opinion of another.  *Olde St. Andrews*, 210 F. App'x at 476. Be that as it may, this Court echoes the sentiment expressed in Judge Ryan's concurring opinion in *Olde St. Andrews*: "It strikes me as obvious that a non-profit corporation created for the purpose, *inter alia*, of bringing lawsuits to enforce the FHA, has not suffered a 'concrete and demonstrable *injury* to [its] activities,' (emphasis added), simply by conducting one of its activities-finding suable defendants.  But *Hooker* has held otherwise, and it is a binding precedent I am not free to ignore and cannot distinguish in any meaningful way."  *Id.* at 482 (quoting *Havens*, 455 U.S. at 379).

Defendants readily acknowledge that MVFHC sent testers to one or more of the Subject Properties but nevertheless argue that litigation was a foregone conclusion and Plaintiffs always intended to file suit against Defendants.  As such, according to Defendants' theory, any resources that MVFHC diverted were in conjunction with, and not independent of the instant litigation.  In support of their contention, Defendants point to MVFHC's timesheets which contain correspondence between employees who spoke in terms of "once the case is filed" as early as

July 19, 2014.  (Doc. 65-15, Timesheets at 2).  Further, Schmaltz testified that she had gathered

sufficient evidence to file an administrative complaint after her initial test on June 27, 2014, but

elected not to because past administrative complaints were not "effective or timely."  (Doc. 69-2,

Schmaltz Dep. at 176).  Finally, Defendants argue that MVFHC's own timesheets are self-

defeating because they do not reflect any time spent on research or testing in June 2014—when

MVFHC alleges it conducted its testing.

      This is not a novel argument.  Defendants in *Olde St. Andrews* posited the same argument

at the summary judgment stage.  *See Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*,

250 F. Supp. 2d 706, 716 (W.D. Ky. 2003) ("*Olde St. Andrews II*").  There, the trial court stated:

> Relying heavily on *Spann,* Defendants argue that this type of evidence is
> insufficient because the Plaintiffs' "investigation" was undertaken solely in
> anticipation of litigation, was an essential part of the litigation itself and,
> therefore, was not *independent* of the injuries associated with the litigation itself.
> *See Spann,* 899 F.2d at 27.  Defendants contend that the pre-litigation
> investigation in this case is just as "manufactured" as the cost of the litigation
> itself, and will render the Article III requirements meaningless because any
> organization can create standing merely by "investigating" the claim before filing
> suit.  Defendants' argument has a good deal of appeal, especially in this case.  If it
> was not for this rule, any organization could manufacture Article III standing
> merely by filing suit.  *See id.*  Here it appears that Plaintiffs' investigation efforts
> were no more than a necessary precursor of this litigation.  As Defendants point
> out, after the investigation Plaintiffs did not even make an attempt to contact any
> of the Defendants before filing this lawsuit.

*Id.* [4]  The trial court ultimately concluded "[a]lthough Defendants [sic] arguments are very

persuasive, the Court cannot ignore that in *Hooker* the Sixth Circuit found standing in a case

very similar to the present."  *Id.*

---

[4] At first blush, this approach may seem especially attractive in instances such as the present where housing organizations conduct an investigation on their own volition, rather than at the request of an aggrieved individual. However, the Supreme Court has recognized the importance of private enforcement actions within the context of the FHAA and Congress' intent to define standing "as broadly as is permitted by Article III of the Constitution. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972).  The FHAA specifically allows an aggrieved person to bring suit and defines "person" to include corporations, associations, and unincorporated organizations such as Plaintiffs. *See* 42 U.S.C. §§ 3613(a)(1)(A); 3602(d).  Accordingly, "the sole requirement for standing to sue under

Additionally, there is considerable record evidence to support MVFHC's argument in favor of standing.  No fewer than four MVFHC employees have provided deposition testimony detailing the fact that testers were sent and MVFHC diverted *some* resources to investigating the purported housing discrimination.  (*See* Docs. 58-5; 58-6; 58-8; 58-31).  Defendants concede as much. (Doc. 58, Mot. at 7–9).  This evidence is sufficient to defeat summary judgment under the Sixth Circuit's lenient standard.

In addition to their argument relating to whether Defendants' injuries were truly independent of the instant litigation, Plaintiffs rely on *Connor Grp. I*, 805 F. Supp. 2d 396 and *Olde St. Andrews*, for the proposition that Plaintiffs are required to show that they "devote[d] *significant* resources to identify and counteract the illegal practices."  (Doc. 69, Rep. at 3, 5 (citing *Connor Grp. I*, 805 F. Supp. 2d at 403; *Olde St. Andrews*, 210 Fed. App'x. at 477) (emphasis added)).  Although these decisions noted the plaintiff housing organizations used a significant portion of resources to counteract the allegedly illegal activities of defendants, neither court created a requirement that the organization's use of resources must be significant.  In fact, in *Olde St. Andrews*, standing was conferred where the housing organization diverted only $75 to deploy testers.  *Olde St. Andrews II*, 250 F. Supp. 2d at 716.  As such, the Court is not convinced that diverted resources must be significant.  This position is reinforced by the Sixth Circuit's recognition that "[t]he opportunity cost, the value of the opportunity forgone by using funds on the Olde St. Andrews testing, is real.  In our world of scarce resources, every expenditure of money, time or other resources results in the loss of the benefit that would have resulted if the same time or money had been spent on something else."  *Olde St. Andrews*, 210 F. App'x at 477.

---

[the Act] is the Art. III minima of injury in fact—that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury."  *Havens*, 455 U.S. at 364 (internal quotations omitted).

The only issue that possibly distinguishes this case from *Hooker* and *Olde St. Andrews* is the fact that MVFHC's mission statement limits the organization's geographic service area to the Miami Valley region, which does not include Columbus or Franklin County.  The Sixth Circuit has not addressed whether this distinction is material.  Plaintiffs cite two decisions from the District Court of Maryland that rejected the argument that plaintiffs were merely regional entities:  *Equal Rights Ctr. v. Equity Residential*, 483 F. Supp. 2d 482 (D. Md. 2007) (motion to dismiss stage) and *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707 (D. Md. 2011) (summary judgment stage).  The Court does not find this guidance helpful because in that case, the organization explicitly forwarded a national mission.  *See* 483 F. Supp. 2d at 487 ("Manifestly, ERC is an organization with a mission that is national in scope and breadth.").  While that is not the case here, the Court finds no reason to impose strict geographic limits on a housing organization.  Under Sixth Circuit case law, all that is required is that an organization diverts resources independent of the instant litigation to counteract the conduct of defendants.  *Havens*, *Hooker*, and it their progeny do not explicitly require the injury to be tied to a geographic region, and this Court in good conscience cannot read any such requirement into those cases.  Accordingly, the Court concludes that counteraction measures taken outside an organization's service area do not preclude that organization from suffering an injury.

Under binding Sixth Circuit precedent, this Court finds that MVFHC has presented facts sufficient to support a finding of organizational standing at this stage of the litigation.  When viewing the totality of the evidence in the light most favorable to Plaintiffs, the non-moving party, there is uncontroverted evidence in the record establishing that MVFHC trained and employed testers to investigate alleged discriminatory conditions brought about by one or more of the Defendants.  In the Court's view, these are the same facts present in *Olde St. Andrews* and

14

Defendants have not even attempted to distinguish that case from the present.  Accordingly, MVFHC has standing.

While MVFHC has provided enough evidence to establish standing at this stage, COFHA has not.  COFHA argues that it has standing in the instant action based on two theories: (1) COFHA diverted resources in the form of "redirecting the efforts of Thom Curnutte, COFHA's Fair Housing Specialist and sole full-time employee,"; and (2) COFHA increased its education and outreach efforts to redress the harm Defendants caused to its mission in the form of sending Curnutte to a 2015 conference where he spent 15 hours handing out educational materials.  (Doc. 65, Resp. at 15, 17).

The parties dispute whether Curnutte is an actual employee of COFHA, but there is undisputed record evidence that shows Curnutte is paid by MVFHC and COFHA has never issued a W-2.  (Doc. 69-1, McCarthy Dep. at 50; Doc. 58-16, Curnutte Dep. at 18; Doc. 69-5, Davis-Williams Dep. at 38–40).  McCarthy plainly admits that Curnutte is not a COPHA employee.  (Doc. 69-1, McCarthy Dep. at 93 ("Well, Thom Curnutte works at [the Columbus] office.  He's not a COFHA employee.  He's a Miami Valley employee.")).  Curnutte's relationship certainly does not fit into the common understanding of the employee-employer relationship, which carries a basic connotation that compensation will be given in exchange for services rendered.  Other than asserting that Curnutte works for COFHA, COFHA has not presented an alternative theory by which Curnutte should be considered a COFHA employee.  There is also no evidence in the record to suggest that COFHA *increased* its education and outreach efforts *in response* to Defendants' actions.  Even assuming Curnutte was a COFHA employee at the time he attended the 2015 fair housing conference, COFHA fails to demonstrate that he, or any other representative of COFHA, would not have attended the conference but for

15

Defendants' actions. Further, it is irrelevant that Plaintiffs continue to attend similar conferences to counteract the alleged discrimination of Defendants because standing "is tested by the facts as they existed when the action [was] brought." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) (citing *Smith v. Sperling*, 354 U.S. 91, 93 n. 1 (1957)). Because COFHA has not offered evidence to show that they diverted resources in response to Defendants' actions, it has suffered nothing more than a setback to the organization's abstract social interests and COFHA lacks standing.

**B.      Merits**

Having found that MVFJC has made a sufficient evidentiary showing for the Court to confer standing at this stage of the litigation, the Court will now proceed to the merits-based portion of Defendants' motions for summary judgment. Defendants seek summary judgment on Plaintiffs' disability discrimination and accessibility claims against them.

Plaintiffs hired two separate experts to evaluate the Subject Properties and identify potential violations of 42 U.S.C. § 3604(f). Defendants contend that these inspections were conducted pursuant to the incorrect standard for determining FHAA compliance. Specifically, Defendants claim that the inspectors checked the Subject Properties for compliance not with the general FHAA requirements themselves, but rather with a list of ten safe harbors promulgated by HUD that were created to help ensure accessibility. Defendants further contend that the Subject Properties were all constructed in compliance with the Ohio Building Code, which they purport to be an objective, comparable standard of accessibility.

While the current summary judgment motions were being briefed, Defendants moved to stay discovery pending the Court's resolution of the threshold standing issue. Consequently, Plaintiffs contend that a decision on the merits is premature because more discovery is required before Plaintiffs can sufficiently oppose Defendants' position. Plaintiffs correctly identify that

the Sixth Circuit considers five factors in determining whether a ruling on summary judgment should be deferred because the nonmovant has requested further discovery: (1) when the nonmovant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the nonmovant was dilatory in its discovery efforts; and (5) whether the nonmovant was responsive to discovery requests." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008) (citing *Plott v. Gen. Motors Corp.,* 71 F.3d 1190, 1196–97 (6th Cir. 1995)). These factors all weigh in favor of the Court deferring its ruling on the merits and reopening discovery. Plaintiffs only learned of Defendants' merit-based defenses when their motions for summary judgment were filed. Plaintiffs have submitted an affidavit from counsel detailing the discovery that will be sought to address these newly discovered defenses. The original discovery period was stayed while the Court ruled on the threshold issue of standing and Plaintiffs still have depositions they wish to conduct. Plaintiffs have not been dilatory in seeking these depositions, as several of the remaining deponents were first identified in the Preferred Defendants' motion for summary judgment. Finally, Defendants have not proffered any argument that might suggest Plaintiffs have been less than forthright in responding to discovery requests.

On September 27, 2016, Magistrate Judge Jolson granted Defendants' motion to stay discovery with the instructions "[i]f indeed Plaintiffs do have standing, the parties and the Court will revisit the discovery and dispositive-motion schedule regarding Plaintiffs' argument on the merits." (Doc. 68, Mot. to Stay Ord. at 3). Further, it has been instructed "[i]f Plaintiffs do prevail on the issue of standing, the parties shall file a joint motion for a status conference in order to determine the remaining schedule for discovery and for Plaintiffs to file a dispositive

17

motion. At that point, discovery and the corresponding dispositive-motion deadline will proceed swiftly." (*Id.* at 4). Accordingly, the Court will defer its ruling on Defendants' merit-based arguments as set forth in their respective motions for summary judgment, and the parties are hereby **ORDERED** to proceed in accordance with Magistrate Judge Jolson's September 27 Order.

## IV.     CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment are **GRANTED in part and DENIED in part.**

The Clerk shall **REMOVE** Documents 58 and 70 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**