UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MIAMI VALLEY FAIR HOUSING
CENTER, INC., et al.,

        Plaintiffs,

  v.

PREFERRED LIVING REAL ESTATE
INVESTMENTS, LLC, et al.,

        Defendants.

Case No. 2:15-cv-2737
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This action arises out of alleged violations of the Fair Housing Act, Title VII of the Civil

Rights Act of 1968 ("FHA"), as amended by the Fair Housing Amendments Act of 1988

("FHAAA"), 42 U.S.C. § 3601, *et seq.*  Specifically, Plaintiff Miami Valley Fair Housing

Center, Inc. ("Plaintiff") alleges that Defendants Preferred Real Estate Investments, Inc. ("PREI,

Inc."); Preferred Real Estate Investments, LLC ("PREI, LLC"); Preferred Real Estate

Investments II, LLC ("PREI II"); Andover Park, LLC; Andover Park II, LLC; Taylor House,

LLC; Palmer Square, LLC; Clifton Park, LLC; and Alexander Square, LLC (collectively

"Defendants"), through their design and construction of five multifamily apartment complexes

located in and around Columbus, Ohio, violated and continue to violate the accessibility

requirements of the FHAA, thereby discriminating against individuals with disabilities.  (Am.

Compl. ¶¶ 1, 13, ECF No. 2.)

This action is before the Court on a number of pending matters, all of which are ripe for

review.  For the reasons described herein, the following motions are **DENIED**: Plaintiff's

Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100); Defendants' Motion

for Summary Judgement (ECF No. 101); Plaintiff's Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102); Plaintiff's Motion for Partial Summary Judgment (ECF No. 103).

The following motions are **DENIED** as **MOOT**: Plaintiff's Motion to Strike Defendants' Inadmissible Affidavit Evidence (ECF No. 123); Plaintiff's Motion to Stay Defendant's Motion in Limine (ECF No. 126); Plaintiff's Motion for Expedited Briefing on its Motion to Stay (ECF No. 127).

The following motions are **GRANTED**: Defendants' Motion in Limine Permitting Use of Paul Sheriff's Report and Video (ECF No. 125); Plaintiff's Unopposed Motion for Hearing (ECF No. 143).

This Court hereby **STAYS** this action as described more fully below.

## I.    BACKGROUND

The Court incorporates the background facts described in its March 3, 2017, Opinion and Order resolving the parties' previous motions for summary judgment. (ECF No. 83.) For clarity, it briefly recites a few of those facts and describes new ones relevant to the parties' current motions.

Plaintiff is non-profit Ohio organization that aims to eliminate housing discrimination. It alleges that Defendants are responsible for violations of the FHAA at five multifamily apartment complexes located in and around Columbus, Ohio: Andover Park, Palmer House, Clifton Park, Taylor House, and Alexander Square (collectively "the developments"). Each of the developments is or was owned by the LLC defendant that bears the same name— Andover Park, LLC; Palmer House, LLC; Clifton Park, LLC; Taylor House, LLC; and Alexander Square, LLC (collectively "the ownership LLCs").

PREI, LLC is an Ohio investment entity. (Nick King Aff., ¶ 6, ECF No. 101–6, at PAGE ID # 11295.) It asserts that it holds or held an ownership interest in three of the ownership LLCs: Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC. [1] PREI, LLC has been owned by Nick King and Mike Kenney since 1999. (King Dep. II, ECF No. 98–3, at PAGE ID # 6104–05.) PREI, LLC acquired land as part of a 1031 like-kind tax exchange and then immediately sold it to Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC. (Nick King Aff., ¶ 10, ECF No. 101–6, at PAGE ID # 11296.) That land was then used to build those three corresponding developments. (*Id.*) Aside from that, however, PREI, LLC, has never owned any land. (*Id.*)

PREI II is also an Ohio investment entity. (Nick King Aff., ¶ 6, ECF No. 101–6, at PAGE ID # 11295.) It holds or held an ownership interest in two of the ownership LLCs: Taylor House, LLC, and Alexander Square, LLC. (King Dep., ECF No. 101–2, at PAGE ID # 11268–69; ECF No. 101–10, at PAGE ID # 11344; ECF No. 101–11, at PAGE ID #11354.) PREI II is owned by Mike Kenney, Nick King, and Jennifer King. (King Dep. II, ECF No. 98–3, at PAGE ID # 6171.)

Defendant PREI, Inc. is an Ohio corporation engaged in real estate development and management. It contracted with the ownership LLCs to act as developer and general contractor for each of the developments. In that capacity, PREI, Inc. secured financing for the developments and hired architects, civil engineers, land planners, and other design professionals as well as subcontractors for construction. (Nick King Aff., ¶ 3, ECF No. 101–6, at PAGE ID # 11295; King Dep. Exc., ECF No. 101–2, at PAGE ID # 11255, 11258, 11260, 11246, 11250,

---

[1] PREI, LLC sold its membership interest in Palmer Square, LLC and Clifton Park, LLC in 2015. Aff. Nicholas King, ¶ 8, ECF No. 101–6, at PAGE ID # 11295.

11257, 11259, 11252.) The developments were all developed at the same time or in successive order during a continuous seven-year period. (King Dep., ECF No. 98–2, at PAGE ID # 5786–87, 5795–96, 5853, 5875, 5890, 5895, 5904, 5909, 5918, 5922.) Although PREI II owned a one per cent interest in PREI, Inc., in 2003, PREI, Inc. is now owned by Mike Kenney and Nick King, who are also employed by PREI, Inc. as President and Vice-President respectively. (Nick King Aff., ¶ 5, ECF No. 101–6, at PAGE ID # 11295.) They both oversaw the developments as PREI, Inc. employees. (*Id.* at ¶¶ 1–2.)

As more fully described in the Court's March 3, 2017, Opinion and Order, Plaintiff became aware of the developments in 2014, after someone saw them on a website and noticed what she thought might be FHAA violations. That person visited several of the developments to confirm her suspicions and then sought assistance in investigating the development from Plaintiff and a second non-profit organization, Central Ohio Fair Housing Association ("COFHA"). Those investigation efforts included field testing and hiring several professionals, including an accessibility expert, to evaluate the developments. On August 19, 2015, Plaintiff and COFHA filed suit against the current Defendants and architect Jonathan Barnes Architecture and Design, Ltd. ("JBAD") alleging violations of the FHAA's accessibility requirements. (ECF No. 1.) On March 8, 2017, Defendants were awarded summary judgment on COFHA's claims on the basis that COFHA lacked standing. (ECF No. 83.) On April 11, 2017, Plaintiff dismissed its claims against JBAD. (ECF No. 86.) Discovery closed July 31, 2017, with the exception of punitive damages discovery, which was stayed pending resolution of the parties' dispositive motions. (ECF No. 89.)

Plaintiff and Defendants have both moved for summary judgment and filed a number of other motions related to the same.

## II.    THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). When the moving party has carried this burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

"After the parties have presented their evidence, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party. *Id.* The nonmoving party, however, cannot establish a genuine issue for trial by producing a mere scintilla of evidence in support of its position. *Anderson*, 477 U.S. at 251; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (showing the existence of "some metaphysical doubt as to the material facts" does not create a genuine issue for trial). A genuine issue for trial exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, the court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

### B. Discrimination in Design and Construction Under the FHAA

The FHAA prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Under the FHAA, discrimination includes:

> in connection with the design and construction of a covered dwelling dwelling[2] built for first occupancy after [March 13, 1991], a failure to design and construct those dwellings in such a manner that—
>
> (i) The public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

---

[2] "Multifamily dwellings" covered by the FHAA are defined as "(A) buildings consisting of 4 or more units if such buildings have elevators; and (B) the ground floor units in other buildings consisting of 4 or more units." 42 U.S.C. § 3604(f)(7). The parties appear to agree that the ground floor units at all five developments in this case are covered multifamily dwellings.

(ii) All the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(iii) All premises within such dwellings contain the following features of adaptive design:

    (I) An accessible route into and through the dwelling;

    (II) Light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

    (III) Reinforcements in bathroom walls to allow later installation of grab bars; and

    (IV) Usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

*Id.* § 3604(f)(3)(C)(i)–(iii). Congress did not define many key statutory terms including, for instance, what makes a public or common use area "accessible" or "usable," or what makes premises within dwellings inclusive of "adaptive design." The statute does, however, provide that a party can satisfy the FHAA's adaptive design requirements (paragraph (iii) above) by complying "with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1')."[3] *Id.* § 3604(f)(4). The statute also provides that a party can satisfy its design and construction obligations (paragraphs (i), **(ii)**, and (iii) above) if it complies with a state or local building code that has incorporated the requirements in § 3604(f)(3)(C). *Id.* § 3604(f)(5)(A).

In lieu of more specific statutory guidance, Congress authorized the Secretary of Housing and Urban Development ("HUD") to implement the FHAA and required HUD to provide

---

[3] The American National Standard Institute is a private non-profit organization that establishes, among other things, standards for achieving accessibility in construction.

technical assistance to help parties achieve compliance with the Act. *Id.* §§ 3604(f)(5)(c); 3614(a). Accordingly, in 1989, HUD promulgated implementing regulations that defined some of the Act's key terms. *See* C.F.R. § 100.200 (2015) *et seq.* Shortly thereafter, HUD issued the Fair Housing Accessibility Guidelines ("the Guidelines"). 56 Fed. Reg. 9472 (Mar. 6, 1991) (codified at 24 C.F.R Ch. 1, Subch. A., App. II).

The Guidelines contain technical standards that developers can use to achieve presumptive compliance with the FHAA's design and construction requirements. *Id.* at 9479. For instance, under the FHAA, doors designed to allow passage into and within premises in covered multifamily dwellings must be "sufficiently wide to allow passage by handicapped persons in wheelchairs." § 3604(f)(3)(C)(2). The Guidelines refer to provisions from the 1986 version of ANSI A117.1 or provide exact measurements that will presumptively make a door "sufficiently wide" to allow such passage. [4] HUD regulations provide that compliance with the Guidelines, as supplemented in 1994, constitutes a "safe harbor" that can be used by builders to achieve compliance with the FHAA. *See* 24 C.F.R. § 100.205(e)(2)(i). Compliance with the Guidelines is not, however, mandatory. 56 Fed. Reg. at 9473. The Guidelines do not "prescribe specific requirements which must be met, and which, if not met, would constitute unlawful discrimination" under the FHAA. *Id.* Builders and developers may choose to depart from the Guidelines and seek alternate ways to establish that they have complied with the FHAA's requirements. *Id.* Indeed, the United States Court of Appeals for the Sixth Circuit has explained that "the Guidelines, though relevant and highly significant, are not decisive. The real question is whether . . . [covered multifamily dwellings] are reasonably accessible and useable to most

---

[4] The Guidelines provide that ". . . for primary entry doors to covered units, doors that comply with ANSI 4.13 would meet this requirement . . . . [w]ithin individual dwelling units, doors intended for user passage through the unit which have a clear opening of at least 32 inches nominal width when the door is open 90 degrees, measured between the face of the door and the stop, would meet this requirement . . . . " 56 Fed Reg. at 9506.

handicapped persons." *Fair Housing Council, Inc. v. Village of Olde St. Andrews,* No. 05-5862, 210 Fed. App'x 469, 482 (6th Cir. 2006). That said, the Guidelines are probative— although the touchstone of the compliance analysis is the FHAA, " '[d]efendants undoubtedly face a heavy burden of demonstrating accessibility' in instances where a construction feature does not comply with the HUD Guidelines.' " *Id.*

In addition to the Guidelines, HUD regulations currently identify nine other non-mandatory safe harbors[5] that can be used to achieve presumptive compliance with the FHAA, including the Fair Housing Act Design Manual ("FHAADM"). *See* 24 C.F.R. § 100.205(e)(1)– (2). Like the FHAA, HUD's regulations also provide that compliance with a state or local building code that incorporates the FHAA's design and construction requirements will satisfy the FHAA. *Id.* § 100.205(f).

### C.    Plaintiff's Motion for Summary Judgment[6]

Plaintiff moves for summary judgment. Plaintiff alleges that over 400 accessibility barriers at the five developments violate the FHAA. As evidence of these violations, Plaintiff relies upon an expert report prepared by Mariesha Blazik, who reviewed a partial set of building plans for Andover Park, physically surveyed the other four developments, and identified alleged

---

[5] HUD regulations identify the 1986, 1992, 1998, and 2003 versions of ANSI-A117.1 as safe harbors for the FHAA's adaptive design requirements. 24 C.F.R § 100.205(e)(1). HUD regulations also identify the following safe harbors for the FHAA's design and construction requirements: 1) the Guidelines; 2) the FHAADM, published in 1986, updated in 1998; 3) the 2000 ICC Code Requirements for Housing Accessibility published in October of 2000, with corrections contained in an ICC-issued errata sheet; and 4) the 2000, 2003, and 2006 versions of the International Building Codes provided certain conditions are met. *Id.* § 100.205(e)(2)(i)–(vi).

[6] Two affidavits are attached to Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment: an October 26, 2017, Affidavit from Robert Schutz (ECF No. 112–13) and an October 27, 2017, Affidavit from Thomas Warner (ECF No. 113–4). Plaintiff challenged specific averments in both of those affidavits and moved the Court to strike them. (ECF No. 123.) The Court did not rely on any of the challenged provisions when ruling on any pending motion because, in part, of the parties' responses to the Court's Order for additional briefing. (ECF Nos. 148, 150, 151, 152, 153.) For that reason, Plaintiff's Motion to Strike Inadmissible Evidence (ECF No. 123) is **DENIED** as moot.

deviations from the technical standards contained in the Guidelines.[7] In particular, Plaintiff alleges the following violations:

- At all the developments, there is no accessible pedestrian route from public streets and transportation stops to public use and common use areas.

- At Alexander Square and Taylor House, a number of parking spaces lack adjacent access aisles, and the access aisles that do exist at those two properties and at Palmer House and Clifton Park lack properly placed curb ramps.

- Routes to public use and common use areas include steps or stairs that cannot be traversed by wheelchair users including routes to the leasing office/clubhouse, bowling lane, and a fitness center/tanning room at Clifton Park; the route to the leasing office/clubhouse at Palmer House; the routes to a sunken fireplace lounge and a fitness center/tanning room at Alexander Square; and the route to a sunken fireplace lounge at Taylor House.

- At Alexander Square, the trash disposal area can only be accessed by steps, and although trash disposal areas at Taylor House and Clifton Park have access ramps, the ramp at Taylor House is too steep and the ramp at Clifton Park lacks handrails.

- Protrusions create safety hazards for visually impaired persons on routes to public and common use areas including light fixtures that protrude from breezeways and a cabana wall at Clifton Park; light fixtures that protrude from breezeways at Alexander Square; light fixtures that protrude from the corridors at Taylor House; and a barbeque countertop that protrudes into the route to a pool at Palmer House.

- At Andover Park, Clifton Park and Palmer House, common use restrooms in the clubhouses lack grab bars for wheelchair users, and the grab bars that do exist at Palmer House and Taylor House are too short for safe use.

- At all the surveyed developments, "numerous doors" in dwelling units that lead to bathrooms, bedrooms, and walk-in closets, are too narrow for wheelchair users to enter.

- In 52 units at Alexander Square, 48 units at Palmer House, 20 units at Clifton Park, and 1 unit at Taylor House, the kitchens lack sufficient clearance for wheelchair users to maneuver between counters and other kitchen elements.

- In multiple units at Alexander Square, Clifton Park, and Palmer House, kitchens lack sufficient clearance in front of ranges and cooktops for wheelchair users to use them

---

[7] Blazik assessed whether the developments complied with the Guidelines, which references the FHAADM and incorporates a number of provisions of the 1986 version of ANSI A117.1 (Blazik Dep., ECF No 57–8, at PAGE ID # 1824–25.)

from a parallel position.

- At all the developments, bathrooms are not usable in some of the units because they lack enough floor space to permit a wheelchair user to enter and close the door.

- At 14 units at Alexander Square, 36 units at Palmer House, and 157 units at Taylor House, compartments or alcoves that were constructed around toilets are too narrow for the safe use of grab bars if they were to be installed.

(Pl's Mot. Summ. Jdgmt., ECF No. 103, at PAGE ID # 13171–96.) Plaintiff asserts that because it has produced expert evidence of alleged deviations from the Guidelines, it has also demonstrated that the developments were not designed and constructed in accordance with any of safe harbors recognized by HUD because the Guidelines contain the least restrictive set of accessibility standards of all the safe harbors. (*Id.* at PAGE ID # 13173 (citing Pl's Mot. Summ. Jdgmt. Ex. 29, ECF No. 104–25, at PAGE ID # 15144–51.)) Plaintiff additionally argues that although the versions of the Ohio Building Code ("OBC") that were in effect at the time the developments were constructed contain accessibility requirements,[8] those accessibility requirements fall short of what is required by the FHAA or were interpreted by permitting agents in such a way that the developments received permits even when they failed to comply with the OBC's accessibility requirements. (*Id.* at PAGE ID # 13197–13202.) Plaintiff asserts that because it has established that the developments do not comply with any safe harbors or the OBC, it is entitled to summary judgment.

In opposing Plaintiff's motion for summary judgment, Defendants assert that Plaintiff cannot use Blazik's assessment of Guideline deviations as evidence of non-compliance with all other safe harbors. (Defs' Opp., ECF No. 112, at PAGE ID # 17287–91.) Specifically, Defendant objects to an Exhibit prepared by Plaintiff's counsel that purports to summarize

---

[8] The parties agree that the 2003 OBC was in effect when Alexander Square was designed and constructed and that the 2011 OBC was in effect when the rest of the developments in this case were designed and constructed.

comparable provisions from the Guidelines, the other HUD recognized safe harbors, and the 2011 version of the OBC. (*Id.* (citing Plaintiff's Mot. Summ. Jdgmt. Ex. 29, ECF No. 104–25, at PAGE ID # 15144–51.)) In addition, Defendants point to a report from their expert, Paul Sheriff, who inspected the developments surveyed by Blazik, and found them to be "accessible, usable, and adaptable" and that they "satisfy all aspects of the FHAA." (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11931.) Sheriff's report also rebuts a number of Blazik's specific findings and further opines that her methodologies were flawed including that some of her measurements were done incorrectly and that she applied dimensional tolerances inconsistently. (*Id.* at PAGE ID # 11928–29.) With regard to Plaintiff's other allegations that Sheriff does not specifically rebut, Defendants contest these allegations by pointing to deposition testimony or affidavits and asserting that additional facts demonstrate how those alleged issues do not constitute accessibility barriers or critiquing Blazik's assessments and measurements. (Defs' Opp., ECF No. 112, at PAGE ID # 17302–08.)

On this record, the Court finds that Plaintiff is not entitled to summary judgment. As a preliminary matter, even if all the conditions identified by Plaintiff deviate from the technical specifications contained in the Guidelines, the Guidelines are neither mandatory nor prescribe specific requirements which, if not met, would constitute unlawful discrimination. *Village of Olde St. Andrews,* 210 Fed. App'x at 482; 56 Fed. Reg. at 9473. *See also Barker v. Niles Bolton Assoc., Inc.,* 316 Fed. App'x 933, 941 (11th Cir. 2009) (holding that because the Guidelines are not mandatory, the fact that a covered complex does not comply with the Guidelines does not establish a violation of the FHAA); *United States v. Pacific Northwest Elec., Inc.,* No. CV–01–019–S–BLW, 2003 WL 24573548, at * 12 (N.D. Idaho, Mar. 21, 2003) (holding that the fact that a covered complex does not comply with the Guidelines does not establish a violation of the

FHAA). It is also unclear whether evidence of non-compliance with the Guidelines can constitute proof of non-compliance with all other safe harbors. But again, even if it could, the safe harbors are not mandatory— they constitute a shield rather than a sword. Moreover, Defendants have presented evidence rebutting Blazik's finding of Guideline deviations, challenging her methodologies, and contesting the facts that form the basis for her conclusions. Consequently, for all but one alleged violation, the Court easily concludes that genuine issues of material fact remain as to whether the alleged accessibility barriers violated the FHAA.[9]

The Court has more trouble reaching that conclusion with regard to the alleged lack of accessible routes to fitness centers/tanning rooms located on mezzanines at Clifton Park and Alexander Square. The FHAA requires that "common use portions" of covered multifamily dwellings be readily accessible to handicapped persons. § 3604 (f)(3)(C)(i). The parties apparently agree that these fitness centers/tanning rooms currently constitute common use areas. The parties also appear to agree that these common use areas can only be accessed by stairways, and that therefore, persons in wheelchairs cannot access them. Defendants note that alternative arrangements have been made for wheelchair users at these two developments. Specifically, Clifton Park and another development, Palmer House, are adjacent to one another. (Aff. Nicholas King, ECF No. 112–8, ¶ 14, at PAGE ID # 17514.) Wheelchair users who reside at

---

[9] Some courts have adopted a burden-shifting framework for design and construction cases, pursuant to which a plaintiff can be awarded summary judgment if a plaintiff demonstrates that a covered multifamily dwelling does not comply with the Guidelines or the ANSI A117.1 standards and a defendant fails to respond by presenting evidence that the covered dwelling complies with some other accessibility standard. *See e.g.*, *United States v. Tanski*, No. 1–04–cv–714, 2007 WL 1017020, at *11 (N.D. N.Y. Mar. 30, 2007); *United States v. Quality Built Constr.*, 309 F.Supp. 2d 756, 763 (E.D.N.C. 2003). Plaintiff suggests that this is the governing standard. The Sixth Circuit has not, however, adopted that burden-shifting framework and has instead noted that "the Guidelines, though relevant and highly significant, are not decisive" and on that basis upheld a district court's decision to deny a plaintiff summary judgment where the plaintiff presented unrebutted proof of Guideline deviations. *Village of Olde St. Andrews*, 210 Fed. App'x at 481–82, *aff'g* 250 F. Supp. 2d 706, 720 (W.D. K.Y. 2003) ("The Court cannot grant summary judgment for Plaintiffs where the only uncontested evidence presented by Plaintiffs is a failure to meet the requirements set out in HUD's Guidelines.") In any event, even if that burden-shifting framework governed, Plaintiff would still not be entitled to summary judgment in this case because Defendants have presented some evidence challenging each of the FHAA violations explicitly raised in Plaintiff's motion.

Clifton Park can access a more extensive first-floor fitness center at Palmer House. *Id.* In addition, wheelchair users who reside at both Clifton Park and Alexander Square are offered memberships to off-site exercise facilities in the vicinity. *Id.* The FHAA, however, requires that common use portions of covered dwelling be readily accessible— the statute nowhere indicates that this mandate can be satisfied by providing amenities at alternative locations. Nevertheless, Defendants point out that Plaintiff has failed to produce evidence demonstrating that the fitness equipment (and presumably tanning rooms) were located on the mezzanines at the time Clifton Park and Alexander Square were designed and constructed. (Defs' Resp. to Pl's Supp. Brief., ECF No. 153, at PAGE ID # 20460.) Because Plaintiff bears the burden of proving discrimination at the design and construction stage, the Court ultimately declines to grant Plaintiff summary judgment on these alleged violations because of the possibility that these areas were not designed and constructed as common use areas but were later used as such.

In sum, because there are contested issues of material facts about the alleged violations, Plaintiff's claims are not appropriate for summary judgment, and they should be addressed at trial. Plaintiff's Motion for Partial Summary Judgment (ECF No. 103) is **DENIED**.

### D. Defendants' Motion for Summary Judgment

Defendants also move for summary judgment. Defendant asserts that Plaintiff's claims must be dismissed because Plaintiff has failed to meet its burden of proof. Defendants further assert that even if all of Plaintiff's claims are not dismissed on that basis, claims related to Andover Park must be dismissed because Plaintiff's expert did not physically survey that development, and that claims related to Alexander Square are barred by the statute of limitations. Defendants also assert that claims against PREI, LLC and PREI II should be dismissed because neither of those two entities designed or constructed any of the developments. Defendants

finally assert that Plaintiff's punitive damages claims should be dismissed. Because the Court finds that these assertions are without merit, Defendants' Motion for Summary Judgement (ECF No. 101) is **DENIED**.

### 1. Defendants' Arguments Regarding Plaintiff's Burden of Proof

When asserting that Plaintiff has failed to meet its burden of proof, Defendants advance two arguments. The first argument relates to Plaintiff's evidence of Guideline deviations; the second relates to Defendants' compliance with the OBC.

### a. Guideline Deviations

Defendants first contend that because Plaintiff has only presented evidence of Guideline deviations at the developments, and because the Guidelines are not mandatory, Plaintiff has failed to make its *prima facie* case. (Defs' Mot. Summ. Jdgmt., ECF No. 101, at PAGE ID # 11196–99.) The Court finds that Defendants are not entitled to summary judgment on this basis. Even though the Court agrees that the Guidelines are not mandatory, a finder of fact might be persuaded by evidence related to the alleged absence of design features that tend to make dwellings accessible under the FHAA. A finder of fact might also be persuaded by expert evidence that certain features of the Guidelines are necessary to make a covered dwelling accessible. The Sixth Circuit has explained that although "[t]he real issue is whether the units . . . are reasonably accessible and useable for most handicapped persons" the Guidelines remain "relevant and highly significant," and " '[d]efendants undoubtedly face a heavy burden of demonstrating accessibility' in instances where a construction feature does not comply with the HUD Guidelines.' " *Village of Olde St. Andrews*, 210 Fed. App'x at 482. The Sixth Circuit has thus indicated that evidence of Guideline deviations is sufficient to allow a plaintiff to resist

summary judgment even though such evidence is not sufficient to award a plaintiff summary judgment. Defendants are denied summary judgment on this basis.

### b. Compliance with the 2011 and 2007 OBC

Defendants next contend that its compliance with the OBC, as evidenced by occupancy certificates issued to each of the developments, entitles it to summary judgment. (Defs' Mot. Summ. Jdgmt., ECF No. 101, at PAGE ID #11199–11202).

The FHAA expressly provides that a party can satisfy its design and construction obligations if it complies with a state or local building code that incorporates the requirements found in the FHAA. § 3604(f)(5)(A). Accordingly, Defendants contend that a defendant should be entitled to summary judgment on an alleged violation of the FHAA whenever a covered multifamily dwelling receives a building permit from a jurisdiction with its own accessibility requirements unless a plaintiff shows either: "(1) that the jurisdiction's permitting regime does not comply with the accessibility requirements of the FHAA, or (2) how the builder evaded the permitting regime or wrongfully obtained a permit." (Defs' Mot. Summ. Jdgmt. ECF No. 101, at PAGE ID # 11199) (citing *United States v. Mid-America Apartment Comms., Inc.*, 247 F. Supp. 3d 30, 36 (D.D.C. Mar. 27, 2017)) (*"Post"*). After urging the Court to adopt this summary judgment standard, Defendants contend that the developments received occupancy certificates certifying that they complied with the versions of the OBC in effect when issued, and that Plaintiff cannot demonstrate that any building permits, plan approvals, or occupancy certificates were wrongly or fraudulently obtained. (*Id.* at PAGE ID # 11199, 11201.)

The Court declines to adopt Defendants' proposed standard, which was derived from a Memorandum Opinion issued by the U.S. District Court for the District of Columbia in order to clarify certain legal issues before trial in an FHS case. *Post*, 247 F. Supp. 3d at 34. Specifically,

after the summary judgment stage in *Post*, the parties sought guidance about the type of evidence that could be used in a civil enforcement action brought by the Government to demonstrate that a developer had engaged in a pattern and practice of discrimination under the FHAA. *Id*. Therefore, *Post*, which does not constitute controlling authority, is procedurally distinguishable. More importantly, the parties in *Post* also apparently agreed that North Carolina, Georgia, and Virginia (after 2000) had incorporated the requirements of the FHAA into the accessibility provisions of those states' building codes. *Id*. at 39. Thus, *Post* is also substantively distinguishable because the parties in this case disagree as to whether the relevant versions of the OBC incorporate the FHAA's requirements.

The parties agree that the 2011 OBC governs all but one of the developments.[10] The parties also agree that the 2009 version of ANSI A117.1 provides technical specifications that can be used to make design and construction features accessible under the FHAA.[11] Defendants state that the 2011 OBC contains accessibility provisions and that the 2011 OBC provides that those accessibility provisions can be met by complying with the technical specifications in the 2009 version of ANSI A117.1. (Defs' Supp. Brief., ECF No. 151, at PAGE ID # 20176.) Plaintiff generally agrees but stresses that the 2011 OBC actually allows builders to deviate from a handful of provisions in the 2009 version of ANSI A117.1. (Pl's Supp. Brief., ECF No. 150, at PAGE ID # 20167–68.) Plaintiff further notes that the 2009 version of ANSI A117.1 provides technical standards but it does not address scoping issues, and that a building code's scoping requirements must be coterminous with the FHAA's requirements in order for the building code

---

[10] The parties agree that Alexander Square is governed by the 2007 OBC. The 2007 OBC contains accessibility provisions for units that can be met if a builder complies with provisions from the 2003 version of ANSI A117.1, and accessibility provisions for other areas that can be met by complying with provisions from the Americans With Disabilities Act Accessibility Guidelines ("ADAAG").

[11] The parties agree that the 2009 version of ANSI A117.1 is not one of the HUD recognized safe harbors.

to operationalize the FHAA's standards. (*Id.* at PAGE ID # 20160–61.) Plaintiff asserts the scoping requirements in the 2011 OBC and the FHAA are not, however, coterminous.

Specifically, the 2009 version of ANSI A117.1 provides measurements that could presumptively make a doorway accessible to a wheelchair user under either the FHAA or the 2011 OBC. (*Id.*) But the 2009 version of ANSI A117.1 does not indicate which doors must be accessible. (*Id.*) That scoping issue is addressed by the 2011 OBC— it indicates which doors must be accessible. Plaintiff appears to concede that if the 2011 OBC used the 2009 version of ANSI A117.1 for technical specifications, and the 2011 OBC's scoping requirements matched the FHAA's requirements, then the 2011 OBC would fully operationalize the FHAA. Plaintiff argues that the 2011 OBC's scoping requirements do not, however, match the FHAA's requirements in a number of ways and thus compliance with the 2011 OBC does not ensure compliance with the FHAA. (*Id.* at PAGE ID # 20162–67.) For instance, the 2011 OBC provides that restrooms will be readily accessible if a builder designs and constructs them in accordance with technical specifications from the 2009 version of ANSI A117.1. (*Id.* at PAGE ID # 20163–64.) Pursuant to the scoping requirements in the 2011 OBC, "at least 50 percent but not less than one" of each type of restroom "clustered at a single location" "shall be accessible." 2011 OBC § 1109.2. The FHAA requires, however, that all common use areas be readily accessible by all handicapped persons, and Plaintiff argues that this includes all restrooms at public use and common use areas, not just 50 percent of clustered restrooms. § 3604(f)(3)(C)(i). Thus, Plaintiff reasons, even though compliance with the 2011 OBC will make some restrooms in such areas readily accessible under the FHAA because they will be built in accordance with the technical specifications found in the 2009 version of ANSI A117.1, compliance with the

2011 OBC does not guarantee full compliance with the FHAA because the 2011 OBC does not require that all restrooms in such areas be built in accordance with those technical specifications.

Defendants assert that the 2011 version of the OBC's scoping requirements do match the FHAA's requirements. Defendants assert that the 2011 version of the OBC provides scoping requirements that are " 'based on the 2009 International Building Code ("IBC"),' the same IBC code recognized throughout the country" and that "the IBC provides accessibility scoping requirements that fulfill the scoping requirements of the [FHAA]." (Defs' Supp. Brief, ECF No. 151, at PAGE ID # 20178.) Plaintiff responds that although certain versions of the IBC are HUD recognized safe harbors when adopted without modifications, the 2009 IBC is not one of them. (Pl's Resp., ECF No. 152, at PAGE ID # 20418–19.) It is, instead, a model code that can be adopted by jurisdictions who can and do amend it in ways that impact provisions that are essential to making covered multifamily dwellings accessible. (*Id.*) Plaintiff further asserts that Ohio amended the 2009 IBC when it developed the 2011 OBC, and thus Defendants' reliance on it to defend the 2011 OBC's scoping requirements is misplaced.[12] (*Id.*)

Because the parties contest whether the relevant versions of the OBC incorporate the FHAA's requirements, this matter is distinguishable from *Post* and the Court declines to adopt *Post's* evidentiary ruling as a summary judgment standard in this case. Moreover, the Court notes that the proposed standard appears to misallocate the burden of proof. Defendants ask the

---

[12] Defendants indicate that the scoping requirements for the 2007 OBC, which governed Alexander Square, are based on the 2006 version of the IBC, which is a HUD recognized safe harbor. (Defs' Supp. Brief., ECF No. 151, at PAGE ID # 20182.) Plaintiff asserts that the IBC's is a safe harbor only when adopted without modifications, and that Ohio significantly modified the 2006 IBC when it developed the 2007 OBC. (Pl's Resp., ECF No. 152, at PAGE ID # 20418, n.9.) Plaintiff also asserts that the Columbus Building Department incorrectly interprets the ANSI A117.1 provisions that are referenced in the 2007 OBC, and thus, Plaintiff contends that permits are issued even when those standards are not met. Either way, the parties do not agree that the 2007 OBC's scoping requirements are coterminous with the FHAA's requirements and the Court is unable, on the basis of the arguments presented, to conclude that as a matter of law, they do.

Court to find that a defendant would be entitled to summary judgment any time a covered multi-family dwelling received a permit from a permitting regime with its own accessibility standards unless a plaintiff shows that the jurisdiction's permitting regime does not comply with the accessibility requirements of the FHAA or that a builder evaded the permitting regime or wrongfully obtained a permit. As a practical matter, however, permits are required in virtually every instance of construction. Accordingly, under Defendants' proposed standard, a plaintiff would be required to prove fraud or that the pertinent permitting regime violated the FHAA as a means to defeat a defendant's motion for summary judgment. But a plaintiff is not required to show that a jurisdiction's building code violates the FHAA. Rather, a plaintiff is required to show that a covered multi-family dwelling violates the FHAA. To the extent a defendant wants to use compliance with a state building code as a shield or a safe harbor, a defendant is required to prove that the building code incorporates the FHAA's requirements in order to be awarded summary judgment, not that a plaintiff must prove that it does not.

On the basis of the arguments presented in this case, the Court is not persuaded that, as a matter of law, the 2011 OBC's scoping requirements are coterminous with the FHA's requirements.[13] Notably, the Court does not conclude that the 2011 OBC's scoping requirements do not incorporate the FHA's requirements— the Court is simply unable to conclude that they do. In light that inability, the Court finds that Defendants are not entitled to summary judgment.

---

[13] Whether or not the OBC's scoping requirements match or incorporate the FHA's requirements is a complex and technical question of law. If the parties' upcoming mediation is unsuccessful, the Court will issue an Order prior to trial delineating the legal issues that will need to be resolved by the Court and the factual issues that will need to be resolved by the jury.

### 2.    Andover Park

Defendants argue that even if it is not awarded summary judgment on all of Plaintiff's alleged FHAA violations, claims related to Andover Park must be dismissed because Plaintiff's expert, Blazik, did not physically survey that development and she only reviewed a subset of site-plans. Nevertheless, " 'the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.' " *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 249). Here, Plaintiff has produced expert evidence of alleged accessibility barriers at Andover Park. A trier of fact must assess the appropriate weight to assign that evidence in light of the issues identified by Defendants.[14] Accordingly, the Court denies Defendants' request for summary judgment on claims related to Andover Park on this basis.

### 3.    Statute of Limitations and Alexander Square

Defendants contend that the statute of limitations bars Plaintiff's FHAA claims related to Alexander Square. That development was developed in 2008 and 2009, and it was issued an occupancy certificate on November 11, 2011— approximately four years before this action was commenced.

The FHAA requires a plaintiff to file a complaint "not later than 2 years after the occurrence or the termination of an alleged discriminatory practice . . . whichever occurs last." 42 U.S.C. § 3613(a)(1)(A). With regard to a "discriminatory practice" the FHAA makes it unlawful to "discriminate in the sale or rental, or otherwise make unavailable or deny a dwelling to any buyer or renter." 42 U.S.C. § 3604(f)(1)–(2). Accordingly, the Sixth Circuit has held that "[i]n the context of the construction and design of multifamily dwelling units that are

---

[14] Defendants did not move to exclude any portion of Blazik's expert report.

inaccessible to disabled individuals, the discriminatory act occurs during the sale or the rental of a unit. Thus, once a unit has been sold or rented, the discriminatory act is complete." *Village of Olde St. Andrews,* 210 Fed. App'x at 480.

The Sixth Circuit has also recognized that the two-year statute of limitation may be tolled and that the "limitations period will depend on the specific circumstances of each case." *Id.* at 481. In circumstances where a plaintiff alleges that "the owner of several housing developments engaged in a continuous policy or practice with regard to the non-compliant design and construction of each of the developments, the continuing violations doctrine may toll the running of the limitations period until the last unit of all the implicated developments is initially sold." *Id.* Because the language of 42 U.S.C. § 3604(f)(1) provides that it is unlawful to discriminate in the "sale or rental" of covered multifamily dwellings, the Court concludes that the same rationale applies here, and that in circumstances where a developer or others are alleged to have engaged in a continuing practice with regard to non-compliant design and construction, the continuing violations doctrine may toll the running of the statute of limitations until the last unit of all implicated developments is initially rented. *See Housing Research & Advocacy Ctr. v. WXZ Residential Group,* No. 1:16-cv-2032, 2017 WL 1078956, at * 3 (N.D. Ohio Mar. 22, 2017) (holding that the statute of limitations begins running when the last housing development sells or rents it final unit); *see also Housing Advoc., Inc. v. Berardi & Partners, Inc.,* No:1:10-cv-0790, 2010 WL 4905547, at *7 (N.D. Ohio Nov. 29, 2010).

When determining the existence of a continuous practice, at least one court has analyzed the nature of the relationship between the developments to see if they are independent from one another or if a lack of independence suggests they were collectively developed. *See WXZ Residential Group,* 2017 WL 1078956, at * 3. In this case, Plaintiff points to record evidence

suggesting that these developments were not independent. All of the developments, including Alexander Square, had the same general contractor and developer who was responsible for securing financing for them, and for hiring architects, civil engineers, land planners, and other design professionals as well as subcontractors for construction. (Nick King Aff., ¶ 3, ECF No. 101–6, at PAGE ID # 11295; King Dep. Exc., ECF No. 101–2, at PAGE ID # 11255, 11258, 11260, 11246, 11250, 11257, 11259, 11252.) The developments, which were all located in the greater Columbus, Ohio, area, were developed at the same time or in successive order during a continuous seven-year period. (King Dep., ECF No. 98–2, at PAGE ID # 5786–87, 5795–96, 5853, 5875, 5890, 5895, 5904, 5909, 5918, 5922.) Further, the developments were all advertised on the same "Preferred Living" website. (ECF No. 108–19, at PAGE ID # 16480–84.) Based on these uncontested record facts, the Court finds that Alexander Square and the other properties were collectively developed. Consequently, under the facts of this case, the statute of limitations did not begin running until the initial rental of the last unit in all the developments.

Neither party has, however, pointed to record evidence indicating when that last unit was initially rented. Thus, the Court cannot determine when the statute of limitations began running and if Plaintiff's claims were timely. For that reason, genuine issues of material fact remain as to the statute of limitations and the Court denies Defendants' summary judgment on that issue.

### 4. Claims Against PREI, LLC and PREI II

PREI, LLC and PREI II also move for summary judgment. They argue that the FHAA imposes liability only on those persons or entities that design and construct covered dwellings, and that they did neither.

The FHAA does not identify who can be held liable for design and construction violations, but nor does it include language expressing an intent to limit who can be liable. The

FHAA focuses instead on prohibited acts, making it unlawful to discriminate "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap . . . " 42 U.S.C § 3604(f)(1). The provision of the FHAA that defines discrimination to include the failure to design and construct covered dwellings with specific features is also prefaced with the phrase "*in connection with* the design and construction of covered multifamily dwellings . . . " 42 U.S.C § 3604(f)(3)(c). In light of that prefatory language, the fact that there are no express limitations as to who can be liable, and the FHAA's broad remedial purpose, courts have generally taken an expansive view when determining who can be liable for design and construction claims.

Courts have, for instance, rejected the notion that only an entity that both designs *and* constructs a covered dwelling can be liable for such claims under the FHAA because such a narrow construction would leave too few entities subject to liability and might defeat the FHAA's goal of making housing available to handicapped persons. *See e.g., Baltimore Neighborhoods, Inc. v. Rommel Builders Inc.*, 3 F. Supp. 2d 661, 662, 664–65 (D. Md. 1998); *Unites States v. Shanrie Co., Inc.*, No. 05–cv–306, 2007 WL 980418, at *6–7 (S.D. Ill. Mar. 30, 2007) (citing *Rommel Builders*); *United States v. Quality Built Const., Inc.*, 309 F. Supp. 2d 756, 761–62 (N.D. Ill. 2001) (citing *Rommel Builders*); *Mont. Fair Hous. v. Amer. Capital Dev. Inc.*, 81 F. Supp. 2d 1057, 1062, 1068–69 (D. Mont. 1999) (citing *Rommel Builders*). When rejecting that narrow construction, one district court explained that, "[w]hen a group of entities enters into the design and construction of a covered dwelling, all participants in the process as a whole are bound to follow the [FHAA]." *Rommel Builders*, 3 F. Supp. 2d at 665. In accordance with that principle, claims against a diverse group of participants have been permitted including claims against owners, builders, developers, contractors, architects, engineers, and others. *See, e.g.,*

*Memphis Ctr. For Indep. Living v. R. & M. Grant Co.*, No. 01-2069, 2004 WL 6340158, at * 1

(W.D. Tenn. June 29, 2004) (claims against engineers); *Eastern Paralyzed Veterans Ass'n v.*

*Lazarus-Burman Associates*, 133 F. Supp. 2d 203, 205 (E.D.N.Y. 2001) (claims against builder

of prefabricated units designed and constructed by another defendant); *United States v. Days*

*Inns of Am., Inc.*, 997 F. Supp. 1080, 1083 (C.D. Ill. 1998) (stating that liability encompasses

architects, builders, and planners); *Baltimore Neighborhoods, Inc., v. Cont'l Landmark*, Fair

Hous.-Fair Lending Rep. P 16,236, at 16,236.4 (D. Md. 1997) (finding that real estate firm that

exercised authority over an architectural review board with considerable influence over a myriad

of features relevant to FHAA compliance could be liable).

The theme that emerges from these cases is that a person or entity can be liable for design

and construction claims under the FHAA if that person or entity can affect implementation of the

FHAA's requirements during the design and construction stage. *See Cont'l Landmark*, Fair

Hous.-Fair Lending Rep. at 16,236.4. That interpretation is buttressed by the Eleventh Circuit

Court of Appeals' opinion in *Harding v. Orlando Apts.*, 748 F.3d 1128 (11th Cir. 2014). There,

two plaintiffs visited an apartment complex and identified a number of accessibility issues

including, for instance, that some common areas were not readily accessible due to a lack of

accessible parking. *Id.* at 1130 n.5. Shortly after their visit, a corporate entity who played no

role in the original design and construction of the apartment complex purchased the complex

from the original owner and builder. *Id.* at 1130–31. The Eleventh Circuit concluded that the

subsequent purchaser could not be held liable for design and construction claims under the

FHAA. In reaching that conclusion, the Eleventh Circuit pointed to the prefatory language " '*in*

*connection with the design and construction*' of a covered dwelling" and found that it constituted

an intentional contextual limit on the provision's application. *Id.* at 1131 (citing 42 U.S.C §

3604(f)(3)(c) (emphasis in original). The Eleventh Circuit reasoned that such a limitation was substantially justified given that "accessible designs that are easy to implement at the design-and-construction stage may be excessively costly and difficult to implement once a dwelling has been built." *Id.* at 1132. Moreover, the Eleventh Circuit found that the relevant legislative history supported its conclusion. The Court explained:

> In the report of the Committee on the Judiciary of the House of Representatives recommending passage of the provisions at issue in this appeal (the House Report), the Committee emphasized the comparative ease of incorporating accessible features into a dwelling at the design-and-construction stage. H.R.Rep. No. 100–711, at 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2188 ("The Committee believes that these basic features of adaptability are essential for equal access ... as well as being easy to incorporate *in housing design and construction.*" (emphasis added)); *id.* ("When reinforcements are installed as a part of new construction, there is no aesthetic change to the bathroom and it is of minimal expense. Having to add reinforcements later, however, can be a major structural undertaking with associated expense."); *id.* at 18, 1988 U.S.C.C.A.N. at 2179 (noting that designing dwellings with accessible features would allow occupants with handicaps to "install[ ] grab bars ... without major renovation or structural change"); *id.* (describing the statute's "modest requirements" and noting it does "not add significant additional costs" and "does not require ... the renovation of existing units"). The House Report therefore demonstrates Congress's intent to mitigate the burdens of compliance with the guidelines by applying them only during design and construction when they can be implemented more easily and with less expense.

*Id.* at 1132.

In this case, unlike the subsequent purchaser in *Harding*, PREI, LLC and PREI II do not contend that they were not involved in the design and construction process in any way. Rather, they contend that their participation in the design and construction process was simply *de minimus*, and that this precludes liability. PREI, LLC asserts that it held an ownership interest in Andover Park, LLC, Palmer Square, LLC, and Clifton Park, LLC, and that it acquired land which it immediately sold to those three LLC entities and where the three developments bearing those same names were later constructed. (Aff. Nicholas King, ¶ 10, ECF NO. 101–6, at PAGE

ID # 11296.) PREI II has an ownership interest in Taylor House, LLC and Alexander Square, LLC, which each own the developments that bear those names. (King Dep., ECF No. 101-2, at PAGE ID # 11268–69; ECF No. 101–10, at PAGE ID # 11344.) PREI, LLC and PREI II admit that they signed agreements on behalf of the entities that owned the developments, including agreements for utility easements for services as at the developments, but they assert that they did so in the "normal course of ownership and management, consistent with corporate law." (Defs.' Reply, ECF No. 124, at PAGE ID # 19010).

These facts do not demonstrate that that either PREI, LLC or PREI II performed design or construction work. The Court finds, however, that liability is not narrowly imposed upon only those persons or entities that perform design and construction work, but that all participants in the design and construction process are obligated to follow the FHAA because that is when the statute's requirements can be most easily implemented. *Rommel Builders*, 3 F. Supp. 2d at 665. Moreover, this is not an instance where either of these entities can claim that it was not involved in the design and construction process at all, particularly PREI, LLC, which procured the land where three of the developments were ultimately built. The Court finds, however, that the question of whether either entities' involvement was too negligible to justify the imposition of liability is one that is more appropriate for a trier of fact to evaluate. For these reasons, the Court denies PREI, LLC's and PREI, LLC II's request for summary judgment on the basis that they did not design and construct any of the developments.[15]

### 5. Punitive Damages

Defendants move for summary judgment as to the availability of punitive damages in this action. "[I]f the court finds that a discriminatory housing practice has occurred . . . , the court

---

[15] In light of this conclusion, the Court does not address the parties' arguments related to veil piercing.

may award to the plaintiff actual and punitive damages[.]" 42 U.S.C. § 3613(c)(1). The Sixth Circuit has held that punitive damages are appropriate under the FHAA when defendants act "with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Hamad v. Woodcrest Condominium Ass'n,* 328 F.3d 224, 239 (6th Cir. 2003) (citing *Preferred Props., Inc. v. Indian River Estates, Inc.,* 276 F.3d 790, 800 (6th Cir. 2002).

Defendants cite the following as evidence of their lack of malice: they attempted to comply with the FHAA by hiring and requiring architects to create FHAA–compliant plans; they met regularly with design professionals to discuss accessibility issues; they complied with the accessibility provisions found in the pertinent versions of the OBC; and they addressed compliance issues identified by the Columbus permitting agency.

Plaintiff asserts that Defendants cannot shield themselves from liability by relying on architects and other design professionals and that compliance with the OBC does not guarantee compliance with the FHAA given that their scoping requirements are not coterminous. Plaintiff also asserts that Defendants were previously sued in 2010 for design and construction violations at Alexander Square, and that Defendants failed to take sufficient action after that to ensure that the design and construction professionals it employed there did not commit the same FHAA violations at the other developments. Although Defendants claim that the prior lawsuit was frivolous, Plaintiff contends that the organizational plaintiff in that matter voluntarily dismissed its claims due to financial constraints before those claims were ever analyzed by a court.

In light of these competing contentions, the Court finds that resolution of whether punitive damages should be submitted as an issue to the jury is premature. Entitlement to such damages requires a significant evidentiary showing. This issue is reserved for trial. For these reasons, the Court denies Defendants' request for summary judgment on punitive damages.

## III. PLAINTIFF'S MOTIONS TO EXCLUDE EXPERT EVIDENCE

Plaintiff has also moved to strike the reports and testimony from Defendants' expert witnesses, Sheriff and Mark Drotar.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The Rule allows for a witness, "qualified as an expert by knowledge, skill, experience, training, or education," to testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

Under *Daubert*, *Kumho*, and Rule 702, the district court acts as the gatekeeper of expert testimony. *Id.* In that gatekeeping role, a court only admits expert testimony when: (1) the witness is qualified; (2) the witness's testimony is relevant; and (3) the witness's testimony is reliable. *Id.* at 528–29. That gatekeeping function is not intended, however, to supplant the adversary system or the role of the jury. *See id.* at 531–32. Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. *See id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 532 (quoting *Daubert*, 509 U.S. at 596).

In determining the reliability of expert testimony, the district court's role, and the offering party's responsibility, "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Generally, the expert's opinions must reflect "'scientific knowledge' . . . derived by the scientific method." *Daubert*, 509 U.S. at 590. The test of reliability is, however, a flexible one. *Kumho*, 526 U.S. at 141. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to "opinion" testimony'" (quoting *Daubert*, 509 U.S. at 588)).

The party proffering the expert testimony carries the burden of establishing, by a preponderance of the evidence, the testimony's admissibility. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

## A.     Motion to Exclude Expert Report and Testimony from Paul Sheriff

Plaintiff moves to exclude opinions from Sheriff. As discussed previously, Sheriff assessed the portions of the four developments that were physically evaluated by Plaintiff's expert, Blazik. He found that they were "designed and constructed in fact so as to be accessible, usable, and adaptable for persons with disabilities," and that the each of the developments "has a consistent level of accessibility for individuals in wheelchairs, canes, crutches, and walkers . . ." (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11895.) Sheriff, who was a paraplegic, performed his assessment using a custom-built, made-to-measure wheelchair specifically

designed for evaluating accessibility under the FHAA. His assessment was documented by video recording.

The Court finds that before his untimely death, Sheriff was an expert on accessibility issues. Sheriff owned and operated a consulting business that provided accessibility–related services to individuals with disabilities, architectural firms, property owners, and other businesses and facilities throughout the United States. (*Id.*, at PAGE ID # 11895.) During his thirty–year career, Sheriff performed evaluations and offered strategies for compliance with the Americans With Disabilities Act, the FHAA, and the Air Carriers Act. (*Id.*) He served as a special master, a court monitor, and an arbitrator/mediator in the United States District Court for the District of Hawaii where he monitored the implementation of, and compliance with, settlement agreements, and reviewed and analyzed consent decrees related to accessibility. (*Id.* at PAGE ID # 11896.) He also served as an Independent Compliance Inspector for the Department of Justice and HUD. (*Id.*) He provided blueprint reviews for architects, contractors, and other entities to ensure compliance with accessibility laws and produced Auto CAD Barrier Removal Drawings. (*Id.* at PAGE ID # 11896–97.) He performed site roll–throughs with his custom wheelchair, site–surveys, and barrier identification surveys. (*Id.* at PAGE ID # 11897.) The Court concludes that Sheriff possessed significant experience as an accessibility consultant and specialized knowledge about accessibility issues.

The Court also finds that Sheriff's expert opinions are relevant. When assessing relevance, a court must ensure that the proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *States v. LeBlanc,* 45 Fed. App'x 393, 400 (6th Cir. 2002). In other words, "there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which

the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)

(citing *Daubert*, 509 U.S. at 592). Plaintiff contends that Sheriff's opinions are not relevant

because Sheriff failed to assess whether the developments comply with the Guidelines or one of

the other HUD recognized safe harbors. As discussed previously, however, the Guidelines are

neither mandatory nor prescribe specific requirements which, if not met, would constitute

unlawful discrimination. *Village of Olde St. Andrews*, 210 Fed. App'x at 482; 56 Fed. Reg. at

9473; *Barker*, 316 Fed. App'x at 941; *Pacific Northwest Elec., Inc.*, 2003 WL 24573548, at * 12.

Sheriff opined about accessibility, usability, and adaptability at the four developments and

offered specific critiques of Blazik's methodology and interpretations. (Paul Sheriff Report,

ECF 101–46, at PAGE ID # 11926–31.) The Court thus finds that Sheriff's opinions would

assist a trier of fact because such matters are not within the common knowledge of lay persons.

In addition, the Court concludes that Sheriff's opinions are reliable. When evaluating

reliability, courts generally consider whether an expert's method is testable, whether it has been

subjected to peer review, the rate of error associated with the methodology, and whether the

method is generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94.

Nevertheless, in instances like this, where a witness' expertise is based on specialized knowledge

or experience as opposed to scientific knowledge, consideration of those factors is not always

appropriate. *Kumho Tire Co.*, 526 U.S. at 149–51. The Sixth Circuit has explained that these

factors "are not dispositive in every case" and should be applied only "where they are reasonable

measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir.

2001).

Although the traditional factors are not appropriate in this case, Sheriff's opinion has met

the reliability standard for experts based upon experience. That standard requires an expert to

explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (quoting Fed.R.Evid. 702 advisory committee's note). Sheriff did so. First, Sheriff explained that because his profession involves assisting clients in analyzing compliance with the FHAA, he utilized the framework set forth in the FHAA as the basic scope for his analysis. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11901.) When describing his methodology, he further indicated that he field tested the properties with his made–to–measure wheelchair and then applied his specialized knowledge "of the various guidelines, standards, and regulations, as well as technical interpretations and guidance documents related to the FHAA and the ADA . . . " to analyze whether the developments were accessible. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11905.) Sheriff also explained that he had performed field testing for 25 years using the same made-to-measure wheelchair. (*Id.* at 11907.) That wheelchair measured 28" x 46", which is slightly larger than the standard 26" x 44" wheelchair used by about 90% of the population. (*Id.*; Sheriff Dep., ECF No. 110–3, at PAGE ID # 16988–89.) The wheelchair's other dimensions also remained constant including, for instance, the distance between the floor and the arm rests, the floor and the handles, and the floor and the footplate. (Paul Sheriff Report, ECF 101–46, at PAGE ID # 11910, 11913–14.) Sheriff's report also contains photographs and diagrams illustrating how his wheelchair permitted him to measure things like reach ranges described in the CFR. (*Id.* at PAGE ID # 19556.) Therefore, the wheelchair constituted a reliable movable measuring tool. Sheriff indicated that he used the wheelchair to maneuver through and "evaluate[s] the various components of the living space for its intended purpose in regards to the . . . requirements of the FHAA" and that his evaluation was based on his specialized knowledge.

(*Id.* at PAGE ID # 11905–06.)  Specifically, his evaluations were based upon his "understanding of the purpose and goals of the FHAA," "its Congressional intent," and his "experience working with individuals with disabilities in designing living spaces to meet their specific needs for usability and accessibility." (*Id.* at PAGE ID # 11905.)

Because the Court finds that Sheriff was an expert and that his opinions are relevant and reliable, the Rule 702 criteria has been satisfied.  Plaintiff's Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102) is **DENIED**.

## B.  Motion to Exclude Expert Report and Testimony from Mark Drotar

Plaintiff also moves to exclude expert evidence from Drotar— a rebuttal expert who addressed opinion evidence from Plaintiff's expert, Blazik.  Specifically, Blazik used a two-foot-long digital level to measure and calculate slopes for paved routes to common and public use areas at four of the developments and concluded that excessive slopes made many of them inaccessible.  Drotar analyzed Blazik's measurements and opined that they were inconsistent with the 1986 version of ANSI, which requires slope to be calculated by dividing the change in rise by the change in run.  (Mark Drotar Report, ECF No. 100–5, at PAGE ID # 11057–58.) Drotar explained that run must be measured along the entire length of a feature such as a sidewalk.  (*Id.*)  Because Blazik instead measured run in two-foot increments, Drotar opined that she did not accurately measure run, and thus she could not accurately measure or calculate slope. (*Id.*)  Drotar further concluded that even if Blazik's slope measurements were done accurately, her measurements would only reflect current slope conditions and would not reflect slope conditions that existed when the developments were constructed.  (*Id.* at PAGE ID # 11058–59.) According to Drotar, that is because slopes in concrete sidewalks and asphalt pavements change when exposed to post-construction stressors, such as weather.  (*Id.*)  Drotar further opined that

slopes for concrete pavement must be calculated with on-site measurements, and thus, any slope calculations for Andover Park based on Blazik's plan review are unreliable. (*Id.* at PAGE ID # 11059.)

After reviewing Drotar's *curriculum vitae*, the Court finds that he is an engineering expert. Drotar is a professional engineer licensed in 22 states. (*Id.* at PAGE ID # 11064.) He works as a senior project engineer at SEA, Ltd. ("S-E-A"), which is a forensic engineering firm. (*Id.* at PAGE ID # 1105; Mark Drotar Dep., 99–1, at PAGE ID # 8502.) In that capacity he performs failure studies and investigations with regard to constructed features. (Mark Drotar Dep. 99–1, at PAGE ID # 8502.) His experience includes measurement, confirmation, and determination of whether construction features, including sidewalks, are built in compliance with project plans and specifications. (*Id.* at PAGE ID # 8510–11.) Prior to joining S-E-A, Drotar worked as a project manager at Timmerman Geotechnical Group, Inc.; a project engineer at EDP Consultants, Inc.; and an engineer at Foundation Design, P.C. (Mark Drotar Report, ECF No. 100–5, at PAGE ID # 11063–64.) Drotar has a master's degree in civil engineering, where his studies were concentrated on geotechnical engineering, or the science of soil. (Mark Drotar Dep., 99–1, at PAGE ID # 8506.) He has a bachelor's degree in civil engineering. (*Id.* at PAGE ID # 8505.) He took courses in concrete, soil materials, and asphalt as an undergraduate. (Id. at PAGE ID # 8506.)

Plaintiff asserts that Drotar is not qualified because he is not an expert in the FHAA. Nevertheless, the Sixth Circuit has long held that the fact that a "proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984); *see also, Barreto*, 268

F.3d 319, 333 (6th Cir. 2001) (unfamiliarity with some aspects of banking relationships merely affects weight and credibility, not admissibility). The proper remedy for any perceived deficiencies in Drotar's testimony is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Plaintiff urges that Drotar's opinion is not reliable because, in part, he "did not visit any of the [developments]" or "take his own measurements." (Pls' Mot. to Strike Drotar, ECF No. 100, at PAGE ID # 10288.) Drotar's opinion is not, however, being offered as evidence of a slope. It is being offered to demonstrate weaknesses in Blazik's methodology when taking slope measurements. Rebuttal experts like this generally do not independently assess a fact at issue but instead respond to a prior opinion. *See Rover Pipeline, LLC v. 1.23 Acres of Land, More or Less, Permanent Easement (Pipeline Right-of-Way Servitude)*, No. 17-CV-10365, 2018 WL 3322995, at *15 (E.D. Mich. July 6, 2018) (citing *E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("Rebuttal experts can properly respond[ ] to the content of [the original] expert witness' report and opinions")). Drotar's report indicates that he received and reviewed Blazik's expert reports for this matter, video clips of her site inspection, and transcripts from her deposition. (Drotar Report, ECF No. 100–5, at PAGE ID # 11056.) Accordingly, the Court finds that Drotar's rebuttal opinion is supported by sufficient facts and data and that the opinion is thus reliable for rebuttal purposes. Plaintiff's other objections to the reliability of Drotar's report go to the weight of the opinion, not its admissibility.

The Court also finds that Drotar's expert opinions are relevant and will aid the trier of fact. Plaintiff alleges that excessive slopes make routes to common and public use areas inaccessible at the developments. That allegation is based on her slope measurements.

Testimony that challenges how she determined those measurements is probative rebuttal evidence.

Because the Court finds that Drotar was an expert and that his opinions are relevant and reliable, the Rule 702 criteria has been satisfied. Plaintiff's Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100) is **DENIED**.

## IV. DEFENDANTS' MOTION IN LIMINE

As previously indicated, Defendants' expert, Sheriff, assessed four of the developments in this matter and he video recorded that assessment. In September of 2016, he prepared a report which incorporated the video recording by reference. The record reflects that Plaintiff received a copy of the report and the video before deposing Sheriff in this action in July of 2017; Plaintiff had both items at the deposition; Plaintiff played portions of the video at the deposition; and Plaintiff questioned Sheriff about both items while Sheriff was under oath. Indeed, Plaintiff marked Sheriff's report and the video as exhibits at Sheriff's deposition. (Dep. of Paul Sheriff, ECF No. 98–8, at PAGE ID # 7745.) In December of 2017, however, Sherriff unexpectedly passed away. Defendants move for an order *in limine* permitting them to use Sheriff's report and video at trial.

Federal Rule of Evidence 804 provides that in certain circumstances, former testimony from a witness is not excluded by the rule against hearsay when that witness is unavailable. Specifically, Rule 804(b)(1) provides that when a declarant is unavailable, the Court may accept into evidence:

**(1)** **Former Testimony**. Testimony that:

> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity to and similar motive to develop it by direct, cross, or redirect examination.

The Rule allows the use of deposition testimony from a deceased witness because the opponent of the party seeking admission is typically present at a deposition and thus has the opportunity to cross-examine the witness. Such are the circumstances here.[16] Accordingly, the Court finds that Sheriff's deposition, and any items marked as exhibits at the deposition, including the report and video, may be used at trial. *See Gore v. Maritime Overseas Corp.*, 256 F. Supp. 104, 119 (E.D. Pa. 1966), *aff'd in part, rev'd in part*, 378 F.2d 584 (3d Cir. 1967) (finding that because deposition was admissible, exhibits marked at the deposition were admissible). *See also, Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp.*, 729 F. Supp. 1488, 1499 (D.N.J.), *aff'd sub nom, Associated Bus. Tel. Sys. Corp. v. Greater Capital Hotel Corp.*, 919 F.2d 133 (3d Cir. 1990), and *aff'd sub nom, Appeal of Greater Capital Hotel Corp.*, 919 F.2d 135 (3d Cir. 1990), and *aff'd sub nom, Greater Capital Hotel Corp. v. Dalia*, 919 F.2d 135 (3d Cir. 1990) (stating that "[i]t is well established that generally, if a deposition is admissible, exhibits marked at the taking of the deposition are admissible").

Defendants' Motion in Limine (ECF No. 125) is **GRANTED**. Plaintiff's Motion to Stay Defendant's Motion in Limine (ECF No. 126), and Plaintiff's Motion for Expedited Briefing on its Motion to Stay (ECF No. 127), are both **DENIED** as moot.

---

[16] Plaintiff acknowledges that Defendants can use Sheriff's deposition at trial. (Pl's Opp. Defs' Mot in Limine, ECF No. 129, at PAGE ID # 19520.)

## V.    PLAINTIFF'S UNOPPOSED MOTION FOR HEARING

Plaintiff previously moved the Court for a telephonic hearing to discuss pending deadlines. (ECF No 143.) The Court delayed determination of that motion while the parties' potentially dispositive motions were under active consideration. The Court also Ordered the parties to submit mutually agreeable dates for trial. (ECF No. 147.) The parties have done so. (ECF No. 149.) In their joint submission of dates, the parties also indicate that they have agreed to participate in two days of private mediation starting October 17, 2018. (*Id.*) Accordingly, the Court **STAYS** this action pending that mediation. The parties are **ORDERED** to file a status report describing the results of their mediation by or before October 24, 2018. In their status report, the parties must indicate a mutually agreeable time for a telephonic conference during the week of October 29, 2018, should the parties continue to need one. The Court will revisit the issue of trial dates after the stay in this matter is lifted. Plaintiff's Unopposed Motion for Hearing (ECF No. 143) is **GRANTED** subject to these conditions.

## VI.    CONCLUSION

For all the reasons previously described, the Court **DENIES** the following motions: Plaintiff's Motion to Strike the Report and Testimony of Mark Drotar (ECF No. 100); Defendants' Motion for Summary Judgement (ECF No. 101); Plaintiff's Motion to Strike the Report and Testimony of Paul Sheriff (ECF No. 102); Plaintiff's Motion for Partial Summary Judgment (ECF No. 103).

The Court **DENIES** the following as **MOOT**: Plaintiff's Motion to Strike Defendants' Inadmissible Affidavit Evidence (ECF No. 123); Plaintiff's Motion to Stay Defendants' Motion in Limine (ECF No. 126); Plaintiff's Motion for Expedited Briefing on Defendants' Motion to Stay (ECF No. 127).

The Court **GRANTS** the following motions: Defendants' Motion in Limine Permitting Use of Paul Sheriff's Report and Video (ECF No. 125); Plaintiff's Unopposed Motion for Hearing (ECF No. 143).

Finally, prior to a trial in this case, the Court will hold an oral argument as to whether the OBC's scoping requirements are coterminous with the FHAA requirements, as described in Footnote 13, *Infra*.

This is action is **STAYED**.

**IT IS SO ORDERED.**

_____9-28-2018_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**